# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Roy Warmbold,                                    Civil No. 16-554 (DWF/KMM)

                    Plaintiff,

                                                      **MEMORANDUM**
v.                                              **OPNION AND ORDER**

MINACT, Inc. d/b/a Hubert H.
Humphrey Job Corps Center,

                    Defendant.

---

Matthew A. Frank, Esq., and Steven Andrew Smith, Esq., Nichols Kaster, PLLP, counsel for Plaintiff.

Megan L. Anderson, Esq., and Neil S. Goldsmith, Esq., Gray Plant Mooty, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment by Defendant MINACT, Inc.  (Doc. No. 51.)  For the reasons set forth below, the Court grants the motion.

## BACKGROUND

On January 3, 2013, Plaintiff Roy Warmbold began working for Defendant as a Security Officer at the Hubert H. Humphrey Job Corps Center (the "Center") in St. Paul, Minnesota.  (Doc. No. 56 ("Goldsmith Aff.") ¶ 2, Ex. A ("Warmbold Dep.") at 68:21-69:2, 73:24-74:6, 80:3-11.)  Job Corps Centers are federally regulated facilities that

provide education and training services to help disadvantaged young adults secure employment. (Goldsmith Aff. ¶ 2, Ex. B ("Ealy Dep.") at 10:8-11, 29:23-30:2; Warmbold Dep. at 77:3-7.) Defendant is a private government contractor that operates Job Corps Centers in various states across the country. (Ealy Dep. at 10:3-6, 12-15.) Defendant operated the Center at all relevant times. (*Id.* at 10:16-11:2.) Plaintiff's role included conducting investigations, preparing detailed and accurate reports of incidents, and reporting violations of the law.[1] (Warmbold Dep. at 82:23-83:13 & Ex. 9.) Plaintiff participated in training and education specific to conducting searches, reporting to the St. Paul Police Department ("SPPD"), and the Center's active shooter policy. (*Id.* at 97:1-22, 99:21-100:4, 202:9-203:7.)

After midnight on October 16, 2015, Plaintiff and fellow Security Officer Charles Ammons responded to an incident involving suspected drug use by a student. (*Id.* at 118:17-119:3; Doc. No. 67 ("Frank Decl.") ¶ 3, Ex. 3.) It had been reported that a student (the "Student") appeared to be under the influence, and that the Student's room smelled like what was believed to be marijuana smoke. (*Id.*) Plaintiff and Ammons

---

[1]    A written agreement between the Center and the St. Paul Police Department (the "SPPD") details the concurrent jurisdictional responsibility of the SPPD and the Center's Security Department, stating, in pertinent part, that "[t]he [SPPD] shall be notified immediately of any possible criminal activity occurring on the Job Corps Center and will be the primary investigating agency." (Doc. No. 67 ("Frank Decl.") ¶ 3, Ex. 9.) The Center's Security Department is identified, along with the Center Director, as "the responsible reporting source for any possible criminal activity on behalf of the center." (*Id.*) Plaintiff was aware of his responsibilities under this agreement. (Doc. No. 56 ("Goldsmith Aff.") ¶ 2, Ex. A ("Warmbold Dep.") at 99:12-101:13.) Plaintiff testified that the decision whether to call 911 was typically made in cooperation with a supervisor. (*Id.* at 92:9-94:24, 99:21-100:4.)

arrived and conducted a visual search of the room ("Search One"). (Warmbold Dep. at 120:13-121:1, 292:11-14.) During the search, Plaintiff noted an unidentifiable smell and observed a cigar wrapper on the floor, but did not find any marijuana. (*Id.* at 119:3-5, 121:2-5.) Center Director Debbie Hoppe testified that a Residential Advisor ("RA") informed her of the situation, and Hoppe verbally authorized a targeted search of the Student's room and person. (Goldsmith Aff. ¶ 2, Ex. C ("Hoppe Dep.") at 8:2-6, 62:20-64:21, 65:21-66:9.) Plaintiff stated that he was never instructed to conduct a targeted search, and that neither he nor Ammons sought permission to conduct one.[2] (Warmbold Dep. at 292:24-293:14.)

At around 7:00 a.m. on October 16, 2015, Plaintiff was informed of a situation on Campus involving a student with a gun—the Student involved in the prior incident. (Doc. No. 67 ("Frank Decl.") ¶ 3, Ex. 4 ("Warmbold Statement") & Ex. 7.) Ammons told Plaintiff that an RA had observed a gun in the Student's room, and Ammons instructed Plaintiff to call 911. (Warmbold Dep. at 131:11-132:4; Frank Decl. ¶ 3, Ex. 6.) According to Plaintiff, he immediately proceeded toward Building 6, where the Student's room was located. On the way, Plaintiff passed RA Amidu Oduloye, who also instructed Plaintiff to call the police. (Warmbold Dep. at 132:5-133:24; Warmbold Statement.)

---

[2]    Plaintiff testified that he suggested to Ammons that they perform a more complete search, but Ammons believed they were not permitted to do so. (Warmbold Dep. at 292:15-293:11.) Plaintiff further testified that he believed if they had done a targeted search, they likely would have found the Student's gun. (*Id.* at 166:5-168:1.) He could not explain why he did not seek permission to conduct a more thorough search. (*Id.* at 123:3-124:9.)

Plaintiff called 911 as he headed toward Building 6, and he remained on the phone until police arrived. (Warmbold Dep. at 136:5-137:16, 140:16-20; Frank Decl. ¶ 3, Exs. 20 & 21.) Plaintiff then greeted the officers and escorted them to Building 6. (Frank Decl. ¶ 3, Ex. 10.)

Hoppe testified that around this time she learned there was a gun in Building 6. Hoppe asserts that shortly after, she encountered Plaintiff in a stairwell as she was exiting Building 1 which is on the opposite side of Campus from Building 6. (Hoppe Dep. at 84:10-15, Ex. 22 ("Hoppe Statement"); *see also* Frank Decl. ¶ 3, Ex. 2 ("Campus Map").) According to Hoppe, she asked Plaintiff to accompany her, but he refused, allegedly stating that he would not go where there was a gun. (Hoppe Dep. at 84:21-25; Hoppe Statement.)

Following the Student's arrest, Hoppe convened Center staff and students to explain the events that had transpired. (Hoppe Dep. at 75:12-16, 89:10-24.) According to Plaintiff, Hoppe singled him out at the assembly, stating that, "Officer Roy did what he was supposed to do. . . . He did the right thing." (Warmbold Dep. at 152:15-153:5.) Hoppe, on the other hand, testified that she praised the residential and security staff, collectively, for getting the police there so quickly. (Hoppe Dep. at 90:5-11.) According to Hoppe, she did not have enough information at that time to know who to single out. (*Id.* at 90:16-91:4.)

Sometime after the assembly that day, Hoppe asked Security to check in and around the Student's room to see if the gun had been discharged on Center property. (*Id.* at 93:5-8, 96:21-24.) Plaintiff and RA Bennedict Slobert returned to the room to

investigate the area ("Search Two"). (Warmbold Dep. at 154:7-155:24; Warmbold Statement.) Plaintiff testified that he found a bullet hole on the inside of the solid-wood door that had not gone all the way through. (Warmbold Dep. at 157:5-159:7.) He reported his findings to Hoppe. (*Id.*) Plaintiff then completed an incident report and provided copies to Hoppe and his supervisor. (*Id.* at 160:6-161:7.) The report stated that Plaintiff was the one who called 911 and referenced both Ammons's and Oduloye's directions to call the police. (Frank Decl. ¶ 3, Ex. 7.)

Later on October 16, 2015, Hoppe contacted Human Resources Manager Maranda Williams and requested that Plaintiff be relieved of duty. (Goldsmith Aff. ¶ 2, Ex. D ("Williams Dep.") at 12:23-13:1, 58:24-59:2, 63:9-15.) Hoppe ultimately provided three reasons for requesting Plaintiff's suspension: (1) Plaintiff's inadequate Search One of the Student's room and person; (2) Plaintiff's refusal to accompany Hoppe and asserting that he would not go where a gun was; and (3) Plaintiff had provided false information regarding the bullet hole, which she believed had, in fact, gone through both sides of the door.[3] (Frank Decl. ¶ 3, Ex. 13.) On October 17, 2015, Williams called Plaintiff to

_____

[3]     Hoppe did not provide the third reason until after she personally observed the Student's door on October 18, 2015 and saw a hole that had penetrated through the entire door. She also observed that the Student's bed had a dresser underneath which was inconsistent with Plaintiff's assertion that he had searched "under the bed" during Search One. (Goldsmith Aff. ¶ 2, Ex. C ("Hoppe Dep.") at 100:21-101:1, 111:3-112:12.) Hoppe e-mailed Williams to inform her that the bullet had gone through the door on October 19, 2015. (Frank Decl. ¶ 3, Ex. 11.) On October 21, 2015, Hoppe sent a detailed statement to Williams. (Hoppe Dep., Ex. 22.) Hoppe e-mailed Williams again on October 28, 2015 with a summary of her reasons for suggesting Plaintiff's suspension, listing the three reasons identified above. (Frank Decl. ¶ 3, Ex. 13.)

inform him that he was officially relieved of his duties as a Security Officer, pending

investigation and without pay.  (Warmbold Dep. at 173:19-174:4; Frank Decl. ¶ 3,

Ex. 12.)

Over the next few weeks, Williams worked with Vice President of Human

Resources Kabah Ealy to collect and review additional information regarding the

incidents in question.  (*See* Ealy Dep. at 9:16-22; 54:2-17; 59:24-61:5; 73:25-75:17 &

Ex. 15; *see also* Williams Dep. at 67:4-77:20.)  Ealy's investigation entailed reviewing

written statements, the police report, and MINACT's search policy.  (*Id.*)  After initial

review, Ealy determined that Hoppe's reasons did not justify suspension.  (Frank Decl.

¶ 3, Ex. 14.)  Ealy then sought input from other employees, including one of Defendant's

Vice Presidents of Operations, to gain a better understanding of the search policy and

Plaintiff's conduct.  (Ealy Dep. at 75:11-17, 77:5-80:21.)  Upon review of such

information, Ealy concluded that all of Plaintiff's actions that day, when looked at

together, justified termination.  (*Id.* at 79:4-10.)  On November 5, 2015, Defendant

decided to terminate Plaintiff's employment effective November 6, 2015.[4]  (*Id.*, Ex. 14.)

According to the termination letter, Defendant's decision resulted from Plaintiff's

"violation of MINACT Policy: 880:3 #1 Failure to follow supervisor's instructions,

---

[4]     Around November 4, 2015, Williams and Hoppe prepared a termination package
to present Hoppe's termination recommendation to the MINACT Corporate HR
Department for approval.  (Williams Dep. at 21:20-22:18, 108:15-18.; *see also* Frank
Decl. ¶ 3, Ex. 19.)  The termination was approved by MINACT on November 5, 2015.
(Goldsmith Aff. ¶ 2, Ex. B ("Ealy Dep.") at 90:6-21; Frank Decl. ¶ 3, Ex. 15.)  The
record suggests Plaintiff was not notified of the termination until November 6, 2015, a
Friday.  (Warmbold Dep. at 195:1-197:10.)

perform assigned work or otherwise comply with applicable MINACT, Inc. or facility written policy; failure to follow proper procedures for dorm search, and [his] inability to perform [his] role as Security Officer." (*Id.*)

At the time of the October 16, 2015 incidents, MINACT was under a short-term contract to operate the Job Corps Center which was under consideration for renewal. (Hoppe Dep. at 69:10-70:17.) Hoppe began her role as Center Director in August 2015, and she was aware that MINACT was under scrutiny for its failure to meet expectations regarding the Center's operation. (*Id.* at 69:10-72:13.) In August 2015, a new Active Shooter Policy had been issued, and Hoppe had failed to implement this policy by the time the October 16, 2015 incidents took place. (*Id.* at 47:9-52:2.) Hoppe admitted that she was embarrassed by this failure and explained that she was to blame for the incidents. (*Id.* at 53:10-21, 124:7-8.) MINACT ultimately lost the contract to operate the Job Corps Center, resulting in Hoppe losing her job at the end of February 2016. (*Id.* at 8:13-18, 124:9-12.) Hoppe believed the October 2015 incident "was a big part of the reason why" MINACT lost its contract. (*Id.* at 124:10-12.)

Plaintiff commenced this action in Ramsey County, Minnesota District Court in February 2016. (Doc. No. 1-1 ("Compl.").) The Complaint alleges a single claim for unlawful retaliation under the Minnesota Whistleblower Act, Minn. Stat. § 181.932 (the "MWA"). (Compl. ¶¶ 50-55.) Defendant removed the case to this Court on March 3, 2016. (Doc. No. 1.) On March 9, 2017, Defendant filed the Motion for Summary Judgment currently before the Court. (Doc. No. 51.) Plaintiff opposes the motion. (Doc. No. 66.)

**DISCUSSION**

**I.      Legal Standard**

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574

F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna

Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate

the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.

Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading, but must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.     Plaintiff's Minnesota Whistleblower Act Claim**

The MWA limits Minnesota's at-will employment doctrine by prohibiting

retaliation against any employee who "in good faith, reports a violation, [or] suspected

8

violation . . . of any federal or state law . . . to an employer or . . . law enforcement official."  Minn. Stat. § 181.932; *see Dukowitz v. Hannon Sec. Servs.*, 841 N.W.2d 147, 150 (Minn. 2014) ("In Minnesota, the employer-employee relationship is generally at-will, which means that an employer may discharge an employee for any reason or no reason and that an employee is under no obligation to remain on the job." (quotation marks and citation omitted)).  Minnesota courts analyze MWA claims under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001).  Under this framework, the employee has the burden to first establish a prima facie case by showing: (1) the employee engaged in statutorily-protected activity; (2) the employer took an adverse employment action against the employee; and (3) there exists a causal connection between the first two elements.  *Id.*  If the employee meets this burden, "the burden of production then shifts to the employer to articulate a legitimate, non-retaliatory reason for its action."  *Id.*  "The ultimate burden of proof then rests with the plaintiff to prove that the proffered reason is merely a pretext and that retaliatory animus motivated the adverse action."  *Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 834 (8th Cir. 2007).  "[E]ven if an employer has a legitimate reason for the discharge, a plaintiff may nevertheless prevail if an illegitimate reason 'more likely than not' motivated the discharge decision."  *McGrath v. TCF Bank Sav., fsb*, 509 N.W.2d 365, 366 (Minn. 1993) (citation omitted).  The burden is always on the employee "to prove by a preponderance of evidence that the employer's action was for an impermissible reason."  *Cokley*, 623 N.W.2d at 630.

### A.     Protected Activity

As a threshold matter, Plaintiff argues that this Court and others have applied the wrong standard in determining whether reports constitute protected activity under the MWA.  Specifically, Plaintiff argues that the Minnesota Legislature's 2013 amendment to the MWA defining "good faith" abrogated prior caselaw holding that a report must be made for the purpose of exposing an illegality.  In Plaintiff's view, therefore, his 911 call was protected activity under the MWA because it "was *not* made in knowing or reckless disregard of the truth, and, thus, as defined by the Legislature, made in *good faith*." (Doc. No. 66 at 18.)  In response, Defendant contends that Plaintiff's abrogation argument is not supported by the statute's plain language, principles of statutory construction, or legislative history.  As such, Defendant argues that calling 911 was Plaintiff's position-specific job duty, not protected activity under the MWA.  Further, Defendant avers that Plaintiff's 911 call was not protected because Defendant already had knowledge of the active shooter and had an additional duty to report this type of incident to law enforcement.

The Minnesota Supreme Court recently held that "the 2013 amendment to the Minnesota Whistleblower Act, defining the phrase 'good faith' . . . eliminated the judicially created requirement that a putative whistleblower act with the purpose of exposing an illegality."  *Friedlander v. Edwards Lifesciences, LLC*, 900 N.W.2d 162, 166

(Minn. 2017) (citation omitted).[5]  In *Friedlander*, the court clarified that whereas the expose-an-illegality approach required courts to look at both the report's content and the employee's purpose, "[t]he statutory definition . . . directs us to conduct a different inquiry, looking only to the content of the report."  *Id.* at 165-66.  Accordingly, a report has been made in good faith where an employee makes "a verbal, written, or electronic communication . . . about an actual, suspected, or planned violation of a statute, regulation, or common law, whether committed by an employer or a third party," Minn. Stat. § 181.931, subd. 6, "as long as [it is] not knowingly false or made with reckless disregard of the truth," *Friedlander*, 900 N.W.2d at 165-66; *see also* Minn. Stat. §§ 181.931, subd. 4, 181.932, subd. 3.

Here, the record supports that Plaintiff did, in fact, engage in statutorily-protected activity under the MWA.  Plaintiff made a report when he called 911 and communicated the potential active shooter situation on Campus to law enforcement, and he did so believing that the report was true.  Plaintiff's report was, therefore, made in good faith.  Thus, in accordance with the Minnesota Supreme Court's ruling in *Friedlander*, the Court concludes that Plaintiff has sufficiently established the first element of his prima facie case.

---

[5]      Prior to oral argument on Defendant's Motion for Summary Judgment, Plaintiff requested that this case be stayed pending the Minnesota Supreme Court's decision in *Friedlander v. Edwards Lifesciences, LLC*.  (Doc. No. 62.)  Defendant opposed Plaintiff's request.  (Doc. No. 64.)  On August 11, 2017, Plaintiff filed a Notice of Supplemental Authority informing the Court that the Minnesota Supreme Court had issued its decision in *Friedlander*.  (Doc. No. 79.)  Pursuant to the Court's direction, the parties filed letter briefs stating their positions on the relevance of this authority.  (Doc. Nos. 80, 81, 82.)

The parties do not dispute that Defendant took an adverse action against Plaintiff, establishing the second element of Plaintiff's prima facie case.[6] However, as outlined below, Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact on causation, and thereby fails to survive summary judgment.

## B.      Causation

Plaintiff argues that there is substantial evidence in the record supporting the contention that his 911 call was a motivating factor in his removal from duty and termination. In support of his argument, Plaintiff points to evidence of temporal proximity, fabrication, shifting reasons for his termination, unequal treatment of identically-situated employees, and an inadequate investigation. Defendant argues that any inference of causation drawn from temporal proximity is undermined by intervening events. Furthermore, Defendant argues that there is no evidence of a retaliatory motive because Hoppe did not know that Plaintiff had made the 911 call when she recommended that he be relieved from duty, and she was not the final decision-maker regarding his termination.

To establish a prima facie case under the MWA, a plaintiff must show a causal link between the alleged report and termination. The burden at this stage "is minimal,"

_____

[6]      The parties appear to agree that Plaintiff suffered an adverse employment action when he was terminated from his position as a Security Officer at the Center. (*See generally* Doc. No. 53 at 23; Doc. No. 71 at 17.) Plaintiff does not specifically argue that any other actions by Defendant, such as placing Plaintiff on relieved-of-duty status pending investigation, constituted an adverse action. The Court concludes that this element of Plaintiff's prima facie case is established based on Plaintiff's termination, and the Court does not consider whether any other actions would be sufficient to establish this element.

*cf. Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (citation

omitted), and a plaintiff in an MWA case may establish a causal connection through

direct evidence or through "circumstantial evidence that justifies an inference of

retaliatory motive," *Cokley*, 623 N.W.2d at 632.  The Minnesota Court of Appeals has

emphasized that "[s]peculation, however, is not circumstantial evidence." *Id.* at 633.

Specifically, "[a] fact is proved by circumstantial evidence when its existence can

*reasonably be inferred from other facts proved in the case.*" *Id.*

A retaliatory motive may be inferred from circumstantial evidence pertaining to

temporal proximity and an employer's knowledge of the employee's protected conduct.

*Freeman v. Ace Tel. Ass'n*, 404 F. Supp. 2d 1127, 1141 (D. Minn. 2005), *aff'd*, 467 F.3d

695 (8th Cir. 2006).  The inference becomes stronger the closer a report and termination

are in time.  *See Harnan v. Univ. of St. Thomas*, 776 F. Supp. 2d 938, 947-48 (D. Minn.

2011).  However, while close proximity between an alleged report and termination may

support an inference of reprisal, temporal proximity alone is generally insufficient to

establish an inference of retaliatory motive.  *Id.* at 948 (finding a two-month timespan

between protected activity and termination insufficient to establish causation in an MWA

claim); *Freeman*, 404 F. Supp. 2d at 1135, 1142 (finding no causal connection in MWA

claim where there was no evidence beyond temporal proximity of one month between the

report and termination).  *But see Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 526

(8th Cir. 2017) (noting a case in which a "thirteen-day interval between protected activity

and adverse employment action was 'sufficient, but barely so, to establish causation'"

(quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002)).

Moreover, "the presence of intervening events [may] undermine[] any causal inference that a reasonable person might otherwise have drawn from temporal proximity." *Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006); *see also Childs v. Fairview Health Servs.*, No. A16-0849, 2016 WL 6923709, at *3-4 (Minn. Ct. App. Nov. 28, 2016) (concluding that any causal connection inferred from one-month gap was undermined where the employee had been caught illegally altering timecards shortly before being terminated); *Mervine*, 859 F.3d at 526 (finding that any inference drawn from three-week temporal proximity was negated by employee complaints regarding the plaintiff's misconduct and the employer's subsequent investigation revealing further misconduct).

Here, any inference of retaliatory motive that could have been drawn from the approximately three-week gap between Plaintiff's 911 call and termination is undermined by intervening events. Sometime after Plaintiff's 911 call, Hoppe discovered that a targeted search had not been conducted during Search One. Also, following the gun incident, Plaintiff conducted Search Two and reported to Hoppe that a bullet had penetrated the door but had not gone all the way through. According to Hoppe, this report was false based on her observation of the door. During the ensuing HR investigation, Ealy reviewed MINACT's search policy and spoke with relevant authorities to gain a more thorough understanding of search procedures and guidelines. After doing so, Ealy determined that Plaintiff's performance was inadequate and justified termination. Plaintiff's argument is further belied by his own testimony admitting that he and Ammons should have sought permission to conduct a more thorough Search One.

Plaintiff even recognizes that had they conducted a targeted search, they likely would have found the gun and prevented the active shooter incident. The record, therefore, does not support that Plaintiff's 911 call caused his termination.

The Court acknowledges that there is arguably a question of fact regarding the timing of Hoppe's knowledge of Plaintiff's 911 call,[7] but it is not material. Even if Hoppe did know that Plaintiff had called 911 to report the active shooter before she recommended that he be investigated, there is no evidence in the record to suggest that Hoppe's recommendation to put Plaintiff on relieved-of-duty status or to terminate him was motivated by such knowledge, as opposed to the inadequacies of Plaintiff's searches. Plaintiff theorizes that Hoppe's recommendation and alleged fabrications were motivated by retaliatory animus as a result of the negative attention the Center received after the incident. The Court concludes, however, that this is not a reasonable inference from the record.

As an initial matter, the evidence of Hoppe's alleged animus is sparse and insufficient to justify an inference of retaliatory motive capable of surviving summary judgment. Furthermore, Plaintiff's theory defies commonsense and would require a jury to infer that Hoppe was willing to cover up the potential active shooter incident rather

---

[7] Hoppe asserts that she was unaware that Plaintiff had called 911 when she recommended his removal from duty and termination. (Doc. No. 55 ("Hoppe Aff.") ¶ 4; *see also* Hoppe Dep. at 81:2-17.) However, Warmbold provided Hoppe with a copy of his report stating that he had called 911 before leaving work on October 16, 2015—the same day that Hoppe later recommended that he be relieved of duty pending investigation. In addition, Hoppe's statement sent to Williams on October 21, 2015 notes that Plaintiff "was the officer to call the St. Paul Police." (*Id.*, Ex. 22.)

than report it to the police. Even viewing all of the evidence in Plaintiff's favor, this is an unreasonable and speculative inference that fails to establish causation. MINACT has various policies, procedures, and agreements that specifically encourage calling 911 in such situations. In fact, two other employees directed Plaintiff to call 911 in connection with the potential active shooter, and Plaintiff reported this fact to Hoppe. Finally, according to Plaintiff, Hoppe publicly praised him for calling 911 following the incidents on October 16, 2015.

Plaintiff also makes arguments pertaining to shifting reasons, comparators, and the sufficiency of the investigation. As described below, all three arguments fail to establish a causal connection.[8] First, Plaintiff argues Defendant's changing reasons for his termination show that his 911 call was a motivating factor. This argument is without merit. Hoppe initially based her recommendation on the alleged stairwell conversation and inadequate Search One. Hoppe then added another reason after discovering the discrepancies in Plaintiff's report of Search Two. Adding a reason regarding a subsequent inadequate search does not constitute a shift in reasons. *See id.* at 528 ("Evidence of a substantial shift in an employer's explanation for an employment

---

[8] Plaintiff presented arguments on causation and pretext simultaneously, so the Court will discuss these arguments with respect to causation here. However, some of these arguments are more properly characterized as arguments that are primarily relevant to the question of pretext. *See Mervine v. Plant Eng'g Servs., LLC*, 859 F.3d 519, 526-529 (8th Cir. 2017) (focusing on temporal proximity in connection with causation and analyzing allegations of a biased investigation, false evidence, comparators, and shifting justifications for termination primarily in connection with pretext). In light of the Court's ultimate conclusion that none of Plaintiff's arguments support a reasonable inference of causation or pretext, the distinction is not material at this stage.

decision may be evidence of pretext, but 'an elaboration generally is not.'" (quoting

*Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1004 (8th Cir. 2012))).

Plaintiff also asserts that Defendant continued looking for reasons to terminate Plaintiff,

even after acknowledging that Hoppe's allegations did not justify suspension.  After

initially concluding that Hoppe's reasons did not justify suspension, Ealy spoke with

various employees to learn more about search procedures.  With a thorough

understanding, Ealy concluded that Plaintiff's collective failures were serious enough to

warrant termination.  This sequence of events does not support an inference of retaliation.

Next, Plaintiff argues that similarly situated employees (in particular, Ammons)

were treated more leniently.  Plaintiff's argument, however, is flawed.  Neither Ammons

nor any other employee took part in both searches or allegedly refused Hoppe's request

on the day of the active shooter incident.  Therefore, Plaintiff cannot establish persuasive

comparator evidence to support an inference of retaliatory motive.  *Cf. Harvey v.

Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994) (noting, in analyzing pretext, that

a plaintiff "has the burden of proving that he and the disparately treated [comparators]

were similarly situated in all relevant respects" (quotation marks and citation omitted)).[9]

Finally, Plaintiff argues that Defendant failed to conduct a thorough investigation

of Hoppe's allegations.  Even assuming Defendant conducted a poor investigation,

---

[9]     Defendant argues that Ammons is not a proper comparator because, taking
Plaintiff's protected-activity arguments to be true, Ammons also engaged in protected
activity by directing Plaintiff to call 911.  Ammon is not a proper comparator in any case
because he did not engage in the same conduct as Plaintiff, so the Court need not resolve
this argument.

however, this would not make an inference of retaliatory motive based on Plaintiff's 911 call any more reasonable under the circumstances. Thus, Plaintiff has failed to show a causal connection based on any inadequacies in Defendant's investigation.

Accordingly, even viewing the record in the light most favorable to Plaintiff, the Court concludes that Plaintiff cannot point to sufficient evidence in the record that reasonably supports a causal link between his 911 call and termination. Plaintiff, therefore, fails to establish a prima facie case of retaliation under the MWA. Furthermore, even if Plaintiff could establish his prima facie case, he nevertheless fails to demonstrate that Defendant's proffered reasons were pretext for unlawful retaliation.[10]

### C.    Pretext

Plaintiff's arguments for pretext and causation are identical. Thus, Plaintiff argues that evidence of temporal proximity, fabrication, shifting reasons, unequal treatment of identically-situated employees, and an inadequate investigation demonstrate that Plaintiff's 911 call was a motivating factor in his termination. Defendant argues that Plaintiff cannot point to evidence that creates a genuine issue of fact for trial. Specifically, Defendant reiterates Hoppe's alleged lack of knowledge of Plaintiff's 911 call and Ealy's independent investigation and decision. Further, Defendant urges the Court to defer to Defendant's business judgment and not ask whether Plaintiff was fired for the right reason.

---

[10]    Plaintiff concedes that Defendant did, in fact, provide legitimate, non-retaliatory reasons for terminating Plaintiff's employment. (Pl.'s Reply at 17.)

The burden of proof to establish pretext is higher than that required to establish a prima facie case. *Buytendorp*, 498 F.3d at 835-36. Pretext can be established by showing that an employer's justification "is unworthy of credence" or "by showing that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies." *Childs*, 2016 WL 6923709 at *4 (quotation marks and citations omitted). Ultimately, "[t]he relevant question is whether a reasonable jury could find that [the employer's] proffered reason for the termination was a mere pretext to mask retaliatory animus." *Buytendorp*, 498 F.3d at 837.

Here, Plaintiff has pointed to no evidence beyond that offered in support of the causal connection element of his prima facie claim. In fact, Plaintiff offers the exact same arguments for both causation and pretext. As the Court has already concluded, Plaintiff failed to establish causation. The Court acknowledges that genuine disputes exist regarding a number of Hoppe's allegations in support of Plaintiff's termination. Viewing the record in Plaintiff's favor, the Court is also persuaded that reasonable jurors could conclude that Defendant conducted a poor investigation. However, "[i]n determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred." *Mervine*, 859 F.3d at 527 (quoting *Macias Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 842 (8th Cir. 2008)). Plaintiff has failed to present sufficient evidence to raise a genuine issue of fact regarding Defendant's genuine belief that Plaintiff's inadequate performance warranted termination.

Further, even if a jury could conclude that Defendant relied on inaccurate or insufficient reasons, this is not the same as concluding that one of Defendant's actual reasons for terminating Plaintiff was because he called 911 to report a potential active shooter. *Cf. Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008) ("[T]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." (citation omitted).) The Court, therefore, concludes that Plaintiff has not presented sufficient evidence to create a triable question of fact as to whether Defendant's proffered reasons were simply a pretext for retaliation. Thus, the Court grants Defendant's Motion for Summary Judgment.

## ORDER

Based on the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's Motion for Summary Judgment (Doc. No. [51]) is **GRANTED**.

2.     Plaintiff's Complaint (Doc. No. [1-1]) is **DISMISSED WITH PREJUDICE**.

3.     Plaintiff's Objection (Doc. No. [65]) to the March 13, 2017 Order of

Magistrate Judge Katherine Menendez (Doc. No. [59]) Denying Plaintiff's Motion for

Leave to Amend His Complaint to Add Punitive Damages (Doc. No. [44]) is **DENIED

AS MOOT**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  October 24, 2017              s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       United States District Judge